## Minniard v. Commonwealth.

(Decided March 24, 1914.)

## Appeal from Perry Circuit Court.

1.  Criminal Law—Homicide—Evidence—Sufficiency.—On a trial for homicide, evidence examined and held sufficient to sustain a verdict of guilty.

2.  Evidence—Hearsay.—On a trial for homicide, evidence that witness heard another person say that he committed the crime is hearsay, and was properly excluded.

3.  Homicide—Instructions—Accidental Killing.—Where on a trial for homicide, the instructions required the jury to believe beyond a reasonable doubt that the accused killed the deceased, it it not error to refuse an instruction on accidental killing based on evidence to the effect that the deceased was found dead in a tunnel with a rock on his shoulders, and that the tunnel was dangerous and that rocks frequently fell, and that cars loaded with rails passed through the tunnel and the rails would be about the height of a man's shoulder standing on the side of the track.

4.  Instructions—Reasonable Doubt—Section 238, Criminal Code.— Where a reasonable doubt instruction follows substantially the language of section 238 of the Criminal Code, it is not error to refuse an instruction to the effect that "the law presumes the innocence of the defendant until his guilt has been established by the evidence to the exclusion of a reasonable doubt, and it is the duty of the jury, if it can reasonably do so, to reconcile all the facts and circumstances proven by the evidence in this case with that presumption, and if upon the whole case the jury should have a reasonable doubt of the defendant's having been proven guilty, then they should find him not guilty."

W. E. FAULKNER, H. C. FAULKNER & SONS, J. K. P. TURNER, JAMES BEGLEY and CASH EVERSOLE for appellant.

JAMES GARNETT, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Defendant, Chester Minniard, was convicted of murder and given a life sentence in the penitentiary. He appeals.

Briefly stated, the facts are as follows: During the fall of 1912 the Lexington & Eastern Ry. Co. was engaged in construction work in Letcher and Perry coun-

ties. On its line a few miles below Hazard is a tunnel known as the Hoskins Tunnel. This tunnel is about 125 yards in length. It lies near and curves with the river. Near the middle of the tunnel there is a place which is not reached by the light from either end. It is, therefore, quite dark. On Sunday, November 3, 1912, Joe Combs, whose boy was missing from home, got word that the body of a man had been discovered in the Hoskins tunnel. On getting to the tunnel he found two laborers from one of the construction camps nearby standing guard at the north end. Combs entered the tunnel with a light. Near the center Combs found the body of a man on the right-hand side of the track going down, and on the inside of the curve. The body was lying face downward; the lower limbs were stretched out straight; the feet close together, the arms near the body, and the face turned towards the track. A large rock, weighing about twelve pounds was found on the man's back, between his shoulders. On the end of a crosstie near the man's head were two gloves, lying side by side. On the opposite side of the tunnel, near the man's body, Combs found a sour-wood stick that looked like it had been used for a hand-spike. A few feet from the man's head he found a short piece of iron pipe, one end of which was sticking up between the crossties. As he examined this piece of pipe by the light of his lantern Combs thought that he saw four or five small hairs on the end of it. A man's hat was found a few feet above the body, and below the body there was an empty bottle lying on the track. The rock which Combs found on the man's back appeared to be fresh and clean on one side only.

The same evening a large number of people came to the tunnel on a special train; the body was removed. On examination it was found that there was a wound just above and a little behind the right ear. There was also a wound on the top of the head. The base of the man's skull was crushed. In no place was the skin broken. Between the time that Combs found the body and the appearance of the crowd in the evening, the piece of pipe and the hand-spike disappeared. When the body was first examined no one knew who the deceased was; it was afterwards definitely ascertained that the deceased was Albert Bowman.

At the March (1913) term of the Perry Circuit Court defendant was indicted for the murder of Albert Bow-

man. According to the evidence for the Commonwealth the defendant and Albert Bowman had been engaged in construction work for the railroad. They had been working side by side. Prior to that time they had had some quarrels and one or two fights. Defendant had remarked in the presence of others that he had been imposed upon by Bowman long enough and that he would kill him if it took him ten years. October 31 came on Thursday. Early in the afternoon both the defendant and Bowman were discharged. Each was given a check for his wages. Defendant's check called for $4.65. After being discharged they remained in that vicinity for a short while. Garrett Feltner says that he saw Bowman exhibit in defendant's presence a sum of money consisting of two tens, two fives and four ones. After leaving the bridge where they were at work they stopped at Marion Campbell's store, near the upper end of the bridge. They remained there perhaps half an hour. While there defendant asked for some peanuts and offered his check in payment. Campbell declined to cash his check and defendant did not take the peanuts. Bowman offered to cash the check provided defendant would shave it, but defendant refused. While there and when they left they were in a friendly humor. They started towards the Hoskins tunnel. John Campbell, who was working on the top of a house on the railroad and a short distance above Marion Campbell's store says he saw Bowman and the defendant cross the river going in the direction of the tunnel. On cross examination he was not certain whether it was Thursday or Friday or some other day when he saw the boys. He also admits that he talked with another witness for the purpose of fixing the day. E. C. Combs says that on the Thursday in question a number of men were engaged in construction work both above and below the tunnel; just below the north portal of the tunnel about fifteen men were putting in a spur line; some of them were putting down the track while others were engaged in hauling steel rails on a push car from a point just above the tunnel. Combs saw defendant and another fellow whom he did not recognize on the left-hand side of the tunnel. The two men then went into the tunnel. Afterwards Combs saw defendant standing inside of the tunnel near the center. He then saw defendant leave the tunnel. Defendant was in the tunnel about half an hour. In going through the tunnel they saw nothing

of the body of the man lying by the track. Wilson Fields says that while standing on the ground beside his horse near the house of Wiley Gooch, below the tunnel and on the opposite side of the river, he saw two men approach the north portal of the tunnel and disappear in the cut at the end of the tunnel. He also says that one of the two men was walking in front of the other and that the one behind was the smaller of the two. The one behind carried in his hand some kind of a crooked instrument which looked like a "sled standard." He was acquainted with the two boys and knew them at sight, but would not say that they were Minniard and Bowman. James Combs saw defendant come through the tunnel about two o'clock. Nobody was with him and he was walking fast. S. F. Stacy says that he saw defendant go through the tunnel between two and three o'clock on Thursday and that defendant kept looking back: Lydia Eversole says that defendant came to her store and bought a box of cartridges on Thursday afternoon; he gave her a check but she could not cash it; he then gave her a dollar bill and she returned the change. He seemed excited. Elizabeth Feltner testified that Bowman boarded with her. She took him his dinner on Thursday and that was the last time she saw him. That afternoon she had gone up to the store at the mouth of Big Creek. She saw defendant cross the river at Eversole's house. In a few minutes defendant overtook her. She asked defendant why they were not at work. He replied that Bowman, by fooling around and not working had got him fired. She then asked if Bowman would come back and pay his board. Defendant replied: "No, by God, he won't." Defendant said he didn't know where Albert was; that Albert had also been fired. Defendant came to her house about dusk; she asked him to supper, but he would not stay. When defendant overtook her she was carrying a load and asked him to help. Defendant said he was in a hurry and had to go. This witness and Mose Feltner both tell of threats they had heard defendant make against Bowman. Leon Berkowitz, who runs a clothing store in Hazard, says that he sold defendant a suit of clothes about six o'clock Thursday afternoon. The price was $6.50 or $7.00, and defendant paid for them in cash. Defendant had $25.00 or $30.00 more. It was in five and two dollar bills. Never noticed any larger bill than a five. Lea D. Farler, the aunt of Bowman, who lives in

Hazard, says that the defendant spent the night at her house. A pair of overalls was left in the room occupied by him. These overalls had red stains on them, she did not know whether they were blood or not. William Engle says that he saw defendant and Bowman going up the railroad between the tunnel and Combs' store. He was several hundred yards away at the time. · Adam Combs examined Bowman's body and found on it a check for $4.35 and a one. dollar bill. Pearl Smith says that when defendant reached McRoberts they heard that Bowman had been killed and that a Minniard had killed him. Thereupon defendant changed his name to Chester Combs.

According to the defendant's evidence he and Bowman had some trouble but were friendly at the time of the alleged crime. He denies that Bowman showed him any money. On going to Marion Campbell's store he called for a package of peanuts. His purpose was to get the check cashed. Campbell said he could not cash it; defendant then returned the peanuts. After leaving Campbell's store he and Bowman walked up to the trestle. Bowman tried to get defendant to go up on Second Creek after some liquor. Defendant declined to go; thereupon Bowman left him. Defendant then passed through the tunnel, saw the flagman Dobbs below the tunnel about a hundred yards. In passing through the tunnel he saw a crew of men coming through with a car-load of steel. Albert Bowman was not with him as he went through the tunnel. The tunnel is a little bit dark, but you can walk through it in the day-time without a light. After passing through the tunnel he saw another crew of men about 150 yards from the mouth of the tunnel. He then went to Mack Eversole's and purchased some cartridges. Leaving there he crossed the river. He saw Elizabeth Feltner and another woman; made no remark to her in regard to Bowman not paying his bill, nor did he refuse to help her carry anything. Had she requested it he would have assisted her. Never injured or struck Bowman in any way; never knew how he came to be injured. He afterward went to his boarding-house; went to the bridge and bought a pistol. Swapped his watch for it and paid $5.00 boot. At the time he had about $40.00 which he had saved up; had shown the money to his mother and the youngsters. Went to Si Feltner's, got his suitcase and paid his board; it amounted to $2.65. When

he left he had no overalls with him. He then got on a local freight and went to Hazard. Went to the Jew store and bought a suit of clothes; paid $6.50 for them; gave him a two dollar bill and a five dollar bill. Went to Mrs. Farler's and stayed all night; had stopped there before; knew that she was an aunt of Albert Bowman. Leaving there on Friday morning he went to Big Creek; stopped at the school-house and played with the pupils. That was his home school, everybody knew him. He then went to his own home; then went to the home of John Baker. On Saturday he went to D. Y. Combs' store and met Pearl Smith; then returned home and stayed till Sunday morning. He and Smith then started for Benham, in Harlan County, just this side of Virginia. They stopped at George Minniard's at the head of Big Leatherwood and spent the night. The next day they went out to the works, and through Shelt Drake got employment. While there he wrote to his father and also wrote Nancy Feltner. While at Whitesburg a man came up and said "They are accusing a Minniard boy of killing a Bowman boy in the tunnel." Did not say what Minniard boy or what Bowman boy it was. Pearl Smith and Shelt Drake were with him at the time. He then started to McRoberts. Shelt and Pearl Smith told him if they were in his place they would change his name. He then changed his name to Chester Combs. Before that he had told everybody his name was Chester Minniard. Defendant also denied various statements made by witnesses for the Commonwealth. At the time of the alleged homicide he was seventeen years and two months of age. Bowman was about twenty years of age. Bowman was larger than he.

There was also evidence to the effect that the roof of the tunnel was dangerous, and that rocks would frequently fall from the tunnel. Several witnesses testified to seeing them fall and one or two that they themselves had been injured. There was also evidence tending to show that where a car loaded with steel rails was taken through the tunnel the rails would be about as high as a man's shoulder. It was further shown that it was practically impossible for William Engle to have seen the boys from the point where he was standing. It was also shown that he had remarked to two witnesses that he never saw the boys any more after they left Campbell's store. Newton Stacy, though introduced by the

Commonwealth, testified that the defendant left Bowman at the mouth of Second Creek and came towards the tunnel alone.

It will be observed that the evidence for the Commonwealth tends to establish the following: (1) defendant and Bowman had had previous quarrels and difficulties and defendant had threatened to kill Bowman; (2) they left Marion Campbell's grocery and started in the direction of the tunnel; (3) they were seen approaching the tunnel; (4) they were also seen in the tunnel; (5) defendant came out of the tunnel alone; (6) the body of the deceased was found near the center of the tunnel and at a place where it was quite dark; (7) deceased had considerable money before he started toward the tunnel. When his body was found he had only a small check and $1.00; (8) when Campbell refused to cash defendant's check, defendant returned the peanuts; (9) defendant told Mrs. Feltner that deceased would not return to pay his board; (10) shortly after passing through the tunnel defendant left the community. After going from place to place he learned Bowman's body had been discovered and a Minniard had been accused of murder, and he immediately changed his name; (11) the deceased was last seen alive on Thursday afternoon and defendant was the last person seen with him. No person ever saw deceased from that time until his body was discovered on the following Sunday.

It is well settled that a judgment of conviction will not be reversed on the ground that the evidence is insufficient to support it, unless the verdict is palpably against the evidence, and this rule applies to circumstantial evidence as well as to direct evidence: Hall v. Commonwealth, 152 Ky., 812. While it is true that there was no eye witness to the homicide and that the evidence for the Commonwealth is purely circumstantial, yet we cannot say the verdict was flagrantly against the evidence. On the contrary, the proven facts make out an unusually strong case against the defendant.

But it is insisted that the court improperly excluded certain evidence offered to be given by Katie Fugate and also the affidavit of the defendant to the effect that Harrison and Rebecca Eversole would testify to the same facts. The rejected evidence was to the effect that on Tuesday following the murder Katie Fugate was at the home of Harrison and Rebecca Eversole. While there

a man by the name of Pomp Couch appeared. He stated, in substance, that Chester Minniard was wrongfully accused of the murder of Albert Bowman and that he himself had killed Bowman. Couch offered to verify this statement by showing them his clothes. The next day Katie Fugate and Mrs. Eversole examined the clothes and found the sleeve of a white shirt covered with blood. The presence of the blood on Couch's shirt unexplained by him tended in no way to connect him with the murder of Albert Bowman. Clearly the evidence in question is mere hearsay and does not come within any of the exceptions to the general rule that such evidence is not admissible. If Couch's statements be regarded as in the nature of a confession by him, they would be admissible against him only if he were charged with the homicide. It is strongly urged, however, that as the evidence in this case is purely circumstantial and the statement of Couch is at least a circumstance tending to show that he and not the defendant killed Bowman, the evidence should be admitted for what it is worth. The rule, however, in regard to hearsay evidence does not vary with the character of the evidence for the other side.

The court instructed the jury on the law of murder, manslaughter and self-defense, but it is insisted for the defendant that he was entitled to an instruction on accidental killing. There are instances where an instruction on accidental killing is proper but this rule is confined to cases where the defendant admits the killing and justifies on the ground of accident. In this case there was no testimony on the part of the defendant that he killed Bowman but that the killing was accidental. It is simply a case where there is testimony tending to show that Bowman might have been killed by the fall of a rock or been struck by a rail on a passing car. Under the instructions given by the court a conviction was not authorized unless the jury believed from the evidence beyond a reasonable doubt that defendant killed deceased. Unless they so believed, they were required to acquit. While the evidence in regard to accidental death was competent as tending to show that defendant did not kill deceased, yet we conclude it was not error to refuse a separate instruction covering this phase of the case, in view of the fact that the real issue was whether the defendant did or did not kill the deceased, and this was

presented to the jury by instructions which are not subject to complaint.

The court gave the following instruction on reasonable doubt: "The law presumes the innocence of the defendant until his guilt has been proven beyond a reasonable doubt, and if upon the whole case the jury should have a reasonable doubt from all the evidence as to whether or not the defendant has been proven guilty, they will find him not guilty."

It is insisted that the foregoing instruction is erroneous and that in lieu thereof the court should have given the following instruction: "The law presumes the innocence of the defendant until his guilt has been established by the evidence to the exclusion of a reasonable doubt, and it is the duty of the jury, if it can reasonably do so, to reconcile all the facts and circumstances proven by the evidence in this case with that presumption, and if upon the whole case the jury should have a reasonable doubt of the defendant's having been proven guilty, then they should find him not guilty."

It is true that the last instruction is approved by some courts and that others go even still further: State v. Blydenburg, 135 Ia., 264; 14 A. & E. Ann. Cases, 443; State v. Crabtree, 170 Mo., 642, 71 S. W., 127.

Sec. 238 of the Criminal Code provides, "If there be a reasonable doubt of the defendant being proven to be guilty, he is entitled to an acquittal."

We have held in a number of cases that not only is an instruction in the language of the code sufficient, but it is the better practice to follow the language of the code: Mickey v. Commonwealth, 9 Bush, 593; Ward v. Commonwealth, 14 Bush, 233; Ireland v. Commonwealth, 22 R., 478, 57 S. W., 616; Brady v. Commonwealth, 11 Bush, 282; Payne v. Commonwealth, 1 Met., 370; Tetterton v. Commonwealth, 89 S. W., 8, 28 R., 146; Howell v. Commonwealth, 104 S. W., 685, 31 R., 983; Gatliff v. Commonwealth, 107 S. W., 739, 32 R., 1063.

It has also been held that circumstantial evidence, like direct or positive evidence, should be left to the consideration and determination of the jury without caution or suggestion on the part of the court as to its value or the necessity of scrutinizing it closely: Brady v. Commonwealth, 11 Bush, 282; Stickler v. Commonwealth, 7 R., 226. As the instruction given by the court follows substantially the language of the code, it was not error to refuse the offered instruction.

As the verdict was supported by the evidence and we are unable to find in the record any error prejudicial to the substantial rights of the defendant, it follows that the judgment should be affirmed, and it is so ordered.