## Shelton v. Commonwealth.

(Decided Oct. 19, 1934.)

J. B. JOHNSON, H. H. TYE and R. S. ROSE for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

In the early afternoon of September 1, 1932, the appellant and defendant below, William Shelton, stabbed Harold Bird with the bayonet of a rifle, whereby he died soon thereafter. At the trial of an indictment returned by the Whitley grand jury accusing him of murdering Bird, appellant was convicted of voluntary manslaughter and punished by confinement in the penitentiary for 21 years. From the verdict and judgment pronounced thereon he prosecutes this appeal after his motion for a new trial was overruled. In briefs of counsel for defendant four grounds are argued for a reversal, and which are: (1) The refusal of the court to discharge the jury and continue the case when one of defendant's counsel became ill near the close of the introduction of testimony; (2) error in (a) the admission of testimony offered by the commonwealth, and (b) in the rejection of that offered by defendant; (3) improper argument of prosecuting counsel; and (4) error in the instructions submitted to the jury—each of which will be considered and determined in the order named.

1. There was an examining trial of defendant occurring before the indictment was returned, and one mistrial of the indictment before the conviction from which this appeal is taken. At those two investigations defendant was represented solely by Hon. J. B. Johnson, who is shown to be an able, vigorous, and painstaking attorney, and which is evidenced by the tracks made by him in this record. However, at the second trial of the indictment (the instant one) defendant procured the assistance of Hon. H. H. Tye, who attended the trial and examined some of the witnesses until after defendant and others of his most material witnesses had testified, with only one more of them to be thereafter introduced. At that stage of the trial, Judge Tye became too ill to further participate in it and his associate counsel moved the court to discharge the jury and continue the prosecution, which was overruled, and it is that action of the court that forms the basis of this ground. The only case cited in support of it is that of Jamerson v. Commonwealth, 230 Ky. 704, 20 S. W. (2d) 711, 712, in which the court overruled a similar motion made by defendant therein based upon the same ground and which we declined to disturb on defendant's appeal to this court, although the facts of that case went further towards sup-

porting the grounds for the motion than is done by the facts of this one. The illness of defendant's counsel in that case occurred before the trial began, and, unless he recovered in time to participate in the trial, defendant would lose the benefit of his services throughout the investigation. Also, the absent counsel in that case was the chief one and had been employed by defendant from the beginning. In disposing of the question we referred to section 188 of the Criminal Code of Practice, authorizing the court to postpone the trial of an indictment "upon sufficient cause shown by either party," which we interpreted as vesting in the trial court "the exercise of a judicial discretion," the propriety of which must depend upon the facts of each case, and we closed the discussion by saying: "Here the judge was familiar with the ability of the remaining counsel and had observed their participation in the previous two trials. He is an able and experienced jurist, and throughout safeguarded every right of the defendant. His counsel ably presented his defense, and a consideration of the record shows that the court committed no error and was justified in overruling the motion for a continuance." See, also, the case of Bryant v. Commonwealth, 202 Ky. 427, 259 S. W. 1038, in which a similar contention, based upon the same ground, was overruled, and in which the absence of counsel occurred after the trial had commenced, as was also true in this case. In view of our holding in those two cases, and others that might be cited, it is quite clear that the court did not abuse a sound discretion in making the complained of ruling in this case, since remaining counsel from the inception of the prosecution was thoroughly familiar with the case and well competent to protect defendant's interest at every stage of the trial, and which the record shows that he did.

2. Before taking up either of the subdivisions (a) or (b) of ground 2, we deem it appropriate to make a statement of the substantial facts as developed by the testimony. But before doing so it should be stated that two maps were used on the trial, one prepared by either side, and attorneys in the examination of witnesses would designate the objects and locations inquired about with the use of the word "here," and the witnesses in answering would be equally as indefinite, in so far as picturing the objects and locations, about which they were inquired, in the record. Neither of those maps,

though filed as parts of the record, is brought here, and we are left with no alternative but to grope around in the darkness thus produced in order to inform ourselves of such facts. Counsel could greatly aid the court in the understanding of cases if such drawings or maps were properly made a part of the record and sent to this court.

On the day of the commission of the homicide, Coon Murray and Jim Adkins, with the deceased, were confined in the Whitley county jail on misdemeanor judgments. Some prisoners in jail, including those three, were put to work on the public roads of the county, and after arriving at the place where they were to work on that morning Murray and Adkins walked away from the guards. Bird requested one of the guards to permit him to go after them, and after some parleying he agreed to do so and Bird started on his mission to return Murray and Adkins. The scene of the homicide was upon a bridge across Jellico creek, known as Walker Mill Bridge. About 100 yards from one end of it (it being about five miles from where the prisoners were at work on the road) was the residence of Bob Jones, and where he and his family resided. Between 10 and 10:30 a. m., Bird appeared at the Jones residence sober and in a good humor, and inquired for and obtained a drink of water. He then left in the direction of the bridge from the Jones house and was gone perhaps a couple of hours. About 100 yards at the other end of the bridge was the residence of Tom Shelton, a brother of defendant, and in which he and his family resided. Between 1 and 1:30 o'clock p. m., Bird again appeared at the Jones residence in a very intoxicated condition and again requested a drink of water, which was given him, and he again started towards the bridge some 100 yards away. After the lapse of a few minutes Mr. Jones heard him exclaim, "Oh, Bob, I am killed," and the witness immediately started in his direction and found him mortally wounded with some sharp instrument which had penetrated his side some five or six inches and from which wound blood was profusely flowing. He was first laid by the side of the road and then carried to the porch of the Jones residence, where he soon died.

Two prosecuting witnesses testified that they saw defendant inflict the fatal wound on the body of deceased with a bayonet which he put upon a gun that was

in the residence of his brother, Tom Shelton, where he had spent the greater part of the forenoon. Those witnesses were friends of defendant, and although they are vigorously attacked in this case, there is no motive shown why they should falsify their testimony to the detriment of their friend. One of those witnesses was an old negro by the name of George Harris, who seems to have had no settled home, but spent the most of his time with members of the Shelton family, who appear to have been his long-standing friends and associates, and to whom he was closely attached. According to his testimony he had spent the night before at the home of Tom Shelton, and had taken his noon meal on that day at the home of a nearby neighbor by the name of Lay. The old darky soon thereafter started for the home of Tom Shelton, as did also Mrs. Lay, whose mission was to borrow some soap from Mrs. Shelton.. She walked faster than the old colored witness and she passed him en route to the home of Will Shelton. From the testimony of those witnesses the deceased, Bird, had then left the home of Tom Shelton and had likewise left defendant in a very angry frame of mind. According to them defendant demanded of Mrs. Shelton, and perhaps one of her brothers, who was then there, the gun that had been hanging on the wall, and threatened them if it was not produced. Eventually it was done and defendant took a bayonet that was hanging on the wall and put it on the end of the gun barrel and started towards the bridge. When the bayonet was placed upon the gun, defendant stuck it in the ground a time or two as if to remove some rust upon it and said, in substance, "That will get him." The old negro importuned him to not embark upon such a mission, but to no avail. Witness then watched his course and saw him travel an old road around or through a clump of bushes and emerge on the bridge where deceased was walking in a staggering condition, when defendant approached him and attempted to run the bayonet through him with the result indicated. Mrs. Lay corroborated Harris as to how the homicide was perpetrated, as well as upon some other material points preceding it. Defendant threw the gun in the creek and tried to get the old colored witness to rescue it, but he declined, when either defendant or one of the brothers of Mrs. Tom Shelton did so and put it in a cluster of bushes.

Defendant hid out for some days, after which he

surrendered. His testimony was to the effect that in the early part of the fatal day he went from his father's residence to that of his brother Tom to borrow a horse to ride to a dentist to have some work done to one of his teeth, but his brother had gone to Williamsburg with the horse, which was the only one he possessed. He then went back to his father's residence not far distant for a similar purpose, but no available animal could be obtained and he then returned to the residence of his brother, Tom Shelton, who was absent, but his wife and other members of the family, some of whom were small children, and her two brothers were present. Defendant testified that while remaining at his brother's house and playing with some of the children, Coon Murray appeared and wanted some water, which was given him, and that he was then informed by Murray that he had two other persons with him, who were located behind the barn near the residence, and they were the deceased and Adkins; that he was introduced to Adkins, and that he already knew Bird; that the latter expressed great hunger and a desire for something to eat, whereupon defendant told him that his (defendant's) wife was absent from home but that food could be obtained at Tom Shelton's residence, and the two then went into the house, when Mrs. Shelton was informed of the fact that Bird was intending to lunch there. While waiting for the completion of the meal, he says that Bird observed the gun hanging on the wall and took it down and began trying to operate the plunger; that he was intoxicated, and defendant took it and emptied it of all cartridges, leaving nothing in the barrel nor any loads in the magazine; that shortly thereafter deceased discovered the bayonet on the wall and procured it and began trying to put it on the gun, which he finally succeeded in doing; that about that time dinner was announced, and all present took seats at the table, and shortly after being seated deceased complained of too much soda being in the bread, and also because Mrs. Shelton had prepared no coffee; that he used vulgar as well as profane language, which produced both confusion and controversy and during which deceased turned over the chair in which one of the smaller children was sitting, and attempted to strike one of the brothers of Mrs. Shelton; that he then got up, and in the scramble of doing so he turned over the table and then procured the gun with the intent of taking it

away, and which resulted in a scuffle between him and defendant for its possession, which the latter finally obtained after the scuffle had proceeded into the yard, following which decedent left.

It was after that, and just before the commission of the homicide, that the two prosecuting witnesses referred to appeared upon the scene. Defendant testified that he directed the other members of the family to vacate the house and go to the nearby residence of a Mr. Lawson, while he picked up the empty gun with the bayonet still on it with the intention of going to the home of his father, and that on the way he met deceased at one end of the bridge, as he emerged from the old road that he traveled, and that deceased approached him not only in a threatening attitude but with an expressed determination to inflict bodily harm upon him, and that he did the stabbing in his necessary self-defense, which he said occurred on a sand embankment off the bridge and not upon it, as the commonwealth's witnesses had testified. As to what happened before deceased departed from the Tom Shelton residence defendant was corroborated by Mrs. Tom Shelton and her two brothers, although the commonwealth proved by a number of witnesses that they stated immediately after the homicide that it occurred in the manner testified to by the two prosecuting witnesses supra. None of defendant's witnesses saw or described the homicide.

Moreover, it was shown by Mr. and Mrs. Jones, and by Jay Helton, another commonwealth witness who was at the Jones residence when deceased made his second trip there, that there was no blood at any place off the bridge, but that there was a trail of it to a point on the bridge that could be seen from the residence of Tom Shelton, or from the yard in front of it where the two prosecuting witnesses stationed themselves, which physical fact corroborated their testimony as well as refuted that given by defendant. Those witnesses saw no blood on any embankment away from the bridge. The character of deceased for peace and quietude when intoxicated was proven to be bad, although one or two witnesses feebly testified that it was good. We have thus given the salient facts testified to in the case. There are other facts and circumstances appearing in the record of a more or less guilty nature, and also testimony of a more or less convincing force contradicting material testimony given by defendant and his witnesses; but what

we have stated is sufficient to disclose that the verdict of the jury was amply sustained by the testimony of the commonwealth which was evidently accepted by it. We will now take up the discussion of ground (2).

The only item of testimony argued in briefs to sustain subdivision (a) of this ground was that given by Dr. Stonecipher, who saw defendant at a distance of between 30 or 40 feet about 4 o'clock on the afternoon at the residence of Tom Shelton, and he stated that defendant was then intoxicated. That was some two or three hours after the homicide, and it is insisted that it was too remote to be admissible. Without stopping to determine the point, and without attempting to definitely lay down a pattern by which remoteness may be accurately measured, we have concluded that the evidence complained of was immaterial and nonprejudicial. The old colored witness testified that a jug of whisky was setting in the house of Tom Shelton behind a certain door which he had observed the night before and also upon the fatal occasion, and no one contradicted that testimony, although defendant and his witnesses testified that he was sober, notwithstanding the presence of the liquor in the house, which might account for defendant's protracted visits there on that day preceding and following the homicide, and by which he abandoned all effort to relieve the pain, so far as the record discloses, from his aching tooth.

The argument in support of subdivision (b) of this ground is directed to the refusal of the court to permit defendant in rebuttal to produce and read to the jury a peace bond that some inferior court had required deceased to give upon conviction of some charge of violating the Rash-Gullion Act (Acts 1922, c. 33) relating to the sale, transportation, and possession of intoxicating liquor for beverage purposes. The bond was executed on May 2, 1927, more than five years before deceased met his death. Its offered introduction was for the purpose of establishing the bad reputation of deceased for peace and quietude. It was not only in violation of the rule by which general reputation is established, but it was also too remote to have a bearing on that issue as of the date of the homicide. It was likewise incompetent, if not otherwise objectionable, because the purpose for which it was executed had no tendency to establish the fact proposed to be proven by its introduction. It was not a bond to restrain deceased

from committing breaches of the peace, but only that he would abstain from committing violations of the intoxicating liquor statute then in force in the commonwealth. The court did not err in refusing its introduction.

3. Nine distinct statements of prosecuting counsel in his argument to the jury are complained of under ground 3, and counsel complains that the limitations we have prescribed in dealing with similar objections in prior cases were transgressed to the detriment of their client, and the cases of Housman v. Commonwealth, 128 Ky. 818, 110 S. W. 236, 33 Ky. Law Rep. 311; Goff v. Commonwealth, 241 Ky. 428, 44 S. W. (2d) 306; East v. Commonwealth, 249 Ky. 46, 60 S. W. (2d) 137, are cited and relied on. But an examination of them will disclose that the argument of counsel complained of in them was of a far different character and type than that made by counsel in this case as a foundation for this ground. We have said, in substance, on all occasions requiring an expression from us that counsel has the right to argue the evidence in the case and to draw legitimate deductions and inferences therefrom; but that he transcends his privilege when he attempts to inject material testimony in the case not given at the trial, and when he indulges in any other conduct or remarks calculated to prejudice defendant in the minds of the jury and to wring from it a verdict not supported by the testimony, or any legitimate inferences to be drawn therefrom. In some of the remarks complained of in this case counsel attributed to testimony contradicting defendant on material facts as convicting him of "lying," which is one way of describing its effect, provided the jury believes, as counsel appears to have done, the contradicting testimony. It would have been, to say the least of it, more courteous and would exhibit a greater regard for defendant's feelings, to have employed a more polite term and which we think should have been done; but the jury evidently believed, as counsel no doubt did, that defendant gave false testimony on such issues by accepting that of the contradicting witnesses. Other items of the argument complained of consisted in statements as to counsel's conclusions with reference to the acts and conduct of defendant preceding the homicide for which there was testimony to sustain, and which were based on perfectly legitimate inferences to be drawn from the entire testimony. Such an argument we have frequently said is

not to be condemned, since to deny counsel the right to do so would so confine the limitations of his argument as to render it of practically no service to the commonwealth, and for which reason, without further elaboration, we conclude that this ground is without merit.

4. Under ground 4 complaint is made of instructions 1, 2, 3, and 4 that the court gave to the jury. The criticism of instruction No. 1 is that it possesses the same vice as did the corresponding one condemned in the case of Strange v. Commonwealth, 254 Ky. 57, 70 S. W. (2d) 972, 974, in that the phrase "if you believe from the evidence beyond a reasonable doubt" was not carried throughout that instruction so as to apply to a conviction of voluntary manslaughter of which defendant was found guilty. But, accepting the ruling in that case as the correct one under its exact facts, it by no means follows that our holding therein should govern this case, since the criticized instructions in the two cases are so far separated in their phraseology as to create a vast intervening gulf, thus rendering the one an entire stranger to the other. In that case, as here, the defendant admitted committing the homicide but relied on his right of self-defense. The instruction (No. 1 in that case) said: "If you believe from the evidence beyond a reasonable doubt that in this county before the finding of this indictment, the defendant, W. R. Strange, shot Otis Spurling with a shot gun so that he then and there died from such shooting, you should find him guilty," etc. Nowhere in any subsequent part of it was the phrase "from the evidence beyond a reasonable doubt" incorporated as applicable to either the crime of murder or voluntary manslaughter. That case did not refer to the one of Coleman v. Commonwealth, 207 Ky. 301, 269 S. W. 321, 322, in which other prior ones are cited and in which we said: "The omission of the reasonable doubt phrase in the instruction on manslaughter or murder was not prejudicial where, as here, a correct separate instruction was given on the question of reasonable doubt, and that this and other qualifying phrases at the beginning of an instruction applied throughout same. Powers v. Commonwealth, 110 Ky. 386, 61 S. W. 735, 63 S. W. 976 [22 Ky. Law Rep. 1807] 23 Ky. Law Rep. 146, 53 L. R. A. 245; Coffman v. Commonwealth, 197 Ky. 498, 247 S. W. 355." However, the instruction in the Coleman Case required the jury to believe beyond a reasonable doubt, not only that the de-

fendant killed deceased, but that he did so "willfully, and not in his necessary or apparently necessary self-defense," and which rendered it less objectionable than the one dealt with in the subsequent Strange Case.

Instruction No. 1, of which complaint is made in this case, says at the beginning: "If you believe from the evidence in this case beyond a reasonable doubt that the defendant, Wm. Shelton, in Whitley County, and before the finding of this indictment herein, unlawfully, willfully, feloniously and maliciously, of and with his malice afore-thought, killed and murdered Harold Bird, by cutting, stabbing and wounding the said Harold Bird, with a bayonet, a deadly weapon, with intent to kill the said Bird, from which cuttng, stabbing and wounding the said Bird did immediately die, and not in his necessary or apparently necessary self-defense, you will find the defendant guilty." It is plainly apparent from that excerpt that our conclusion supra with reference to the separating gulf between the two instructions (i. e., the one in the Strange Case and the same one in this case) is abundantly sustained and that counsel is mistaken when they say in brief that, "The Strange Case is conclusive that this case must be reversed." In that case the instruction in its opening statement directed a conviction if the jury believed from the evidence beyond a reasonable doubt that the defendant therein *killed* deceased, a fact that he admitted, and under the peculiar circumstances of the case, and the doubtful phraseology of the remaining portion of that instruction, it was thought that the jury may have been misled thereby. But the criticized instruction in this case, as appears from the inserted excerpt therefrom, entirely removes that criticism and guards the established rights of the defendant in explicit and clearly expressed terms.

The second instructoin is criticized because, as is insisted, it limited the right of defendant in the exercise of his right of self-defense to only cut, stab, and wound deceased, and excluded his right to *kill* him in order to ward off the deadly assault of deceased, and the cases of Adams v. Commonwealth, 212 Ky. 334, 279 S. W. 332, 334 and others are cited in support of that argument. But the Adams Case decides exactly to the contrary. In disposing of the same contention therein made, we said that where the self-defense instruction began by saying, "although you may believe from the evidence that the defendant shot *and killed* deceased," and then later

therein limited his right of self-defense to only *shooting* the deceased, there might be room for the jury to be misled, but that where, as in the Adams Case (and also in this one), the instruction at its beginning did not express defendant's right to *kill* his antagonist, and where there was but one fatal stab or deadly act committed by defendant (as the firing of but one shot or the making of but one stab, the first of which was true in the Adams Case and the latter of which is true in this one), then: "Under those circumstances, and as the instruction was worded in this [Adams] case, the jury could not have been misled, and necessarily understood that, if facts consonant with the law of self-defense existed when appellant shot deceased, all of which were aptly submitted by the instruction given, then appellant had the right to shoot deceased, as he did, from which his death resulted, and that it was their duty in that case to acquit him upon the grounds of self-defense and apparent necessity. There was no opportunity for the jury to be misled by the instruction herein as given." It will, therefore, be seen, as we have already stated, that the Adams case instead of supporting the argument of counsel sustains the instant instruction which they criticize. Other criticisms of instruction No. 2 are not supported by the record, since the alleged criticized vice is not to be found in it.

The criticism of instruction No. 3 is that it did not define the words "feloniously" and "maliciously"; but we have often held that such defining instructions were unnecessary. The same complaint was expressly overruled in the Adams Case, supra, with the citation of other prior ones to the same effect. The only argument made against instruction No. 4 given by the court, which is the reasonable doubt one, is "that it does not advise the jury that, if from the evidence they have a reasonable doubt of guilt they will acquit" and that "there is not a single good instruction in the instructions given." We have carefully examined the reasonable doubt instruction (No. 4), and it is in exact accord with the form of such an instruction that we have universally approved.

We, therefore, conclude that none of the criticisms made by counsel in support of ground 4 for reversal of the judgment is meritorious, and finding no error prejudicial to the substantial rights of the defendant, the judgment is affirmed.