# Thomas v. Commonwealth.

(Decided Dec. 14, 1934.)

M. C. REDWINE and RODNEY HAGGARD for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

Mrs. Nannie R. Thomas (indicted as Mrs. Sam Thomas) appeals from a judgment imposing upon her life imprisonment for murder.

### The Evidence.

About 9 p. m., Saturday, April 7, 1934, some one shot Garnett Craycraft, from which shooting he died about three hours later.

Mrs. Craycraft, the widow of the man slain, testified that some time in December before this shooting she was at the home of her mother, the defendant, on Linden avenue in Winchester. They got into an argument, and the defendant said she would end Garnett Craycraft's life before long. The morning after the shooting she saw her mother at the jail, and asked to buy from her room for three graves in her lot in the cemetery, and Mrs. Thomas said she did not want Craycraft's dead body taken to her house and did not want it on her lot in the cemetery.

William F. Osborne, a clerk in a hardware store, testified that on Saturday morning, March 31st or April 7th, he was unable to say which, he sold to Mrs. Thomas three Peters shells for a 12-gauge shotgun. On the evening of this tragedy, Mrs. Thomas, Carlos Anderson, and Bruce Tackett met at Mrs. Ragland's where Mrs. Thomas boarded. Mrs. Ragland was out, and Mrs. Thomas fixed supper, and the three ate together. Later we find these three in Mrs. Thomas' Oldsmobile coupe. Anderson was at the wheel, Tackett was on the right, and Mrs. Thomas was between them. In this automobile somewhere there was a 12-gauge sawed-off shotgun with a Peters shell in it, a .25-caliber Mauser automatic pistol with at least six steel-jacketed loads in it, a .32-caliber pistol with loads in it, and two or three extra shells for the shotgun.

The automobile halted for a traffic light at the in-

tersection of North Main street and Washington street. Francis Wiley, a son of Mrs. Thomas, and Garnett Craycraft, her son-in-law, were talking on the street corner. Craycraft ran around behind the automobile, and up to the left door, which he opened, and began to pull Anderson out from under the wheel. Three shots were fired to the east by some one or ones in the automobile, and Craycraft retreated to the sidewalk, suffering from a mortal wound. The automobile crossed Washington street to the south side, pursued by Francis Wiley, who leaped upon the right running board at that point, and two shots were fired from the right door of the machine towards the west and at him. Tackett went over the laps of his companions and out of the left door of the coupe, but was soon captured. Wiley stopped the car, policemen came running up, and the arrests of Mrs. Thomas and Anderson followed immediately. Mrs. Thomas, when taken to the police station, asked for a restroom, there was none there, and she was taken to the women's department on the third floor of the jail, where she was told she would find the facilities she wanted. While there, she secreted a .32-caliber pistol, which was soon discovered. It then had one load in it and five empty shells. In the automobile there was found the .25-caliber Mauser with six loads in it and the sawed-off shotgun with one load in it and two or three shells to fit it.

Mrs. Thomas testifies she did no shooting, that Tackett shot Craycraft, and that she picked this .32-caliber pistol up from the floor of the automobile after the shooting. Craycraft was taken to the hospital there in Winchester. When he was undressed, he struggled a bit and blood came out of his mouth; he said to Nelson Gatson, "Turn me over, Nelson, I am going to die," or "Let me turn over, I am going to die." He said, "Mrs. Thomas, Bruce Tackett, and Carlos Anderson were in the car, Mrs. Thomas was in the center and Mrs. Thomas is the one who shot me."

John Ballard had helped take Craycraft to the hospital, and he testified that Craycraft spoke to him and said, "Hello, Ballard," "I am going to die, turn me over." They turned him over on his back, and he said, "Old lady Thomas shot me." Dr. Scobee, who operated on Craycraft in an effort to save his life, and who was in and about there arranging for this operation, did not hear this statement. Four or five other

people who were present were not introduced. A .32-caliber lead ball was cut out of Craycraft's body after he died.

Neither Tackett or Anderson was offered as a witness by either the commonwealth or the defendant.

The defendant urges eleven grounds for reversal, and these various alleged errors we shall group and discuss under six headings.

## The Motion for Continuance.

Mrs. Thomas filed a motion for a continuance based upon the alleged existence of an aroused public sentiment and the allegation that she had not had an opportunity to talk with her codefendant Tackett and had not had sufficient time to prepare her defense. Her motion was overruled, and this was made one of her grounds for a new trial, but, as it is just barely referred to in brief, we shall treat it as waived.

## Alleged Errors in the Evidence.

The first attack is made upon the evidence concerning what Craycraft said at the hospital. We have already set out what that was. Mrs. Thomas urges that by the admission of this there was allowed to go to the jury self-serving declarations of Craycraft made out of the presence of the defendant. This is not a legal controversy between Mrs. Thomas and Craycraft, but one between her and an offended commonwealth, whose law she is alleged to have broken by slaying one of its citizens. The commonwealth is the plaintiff, and, if Craycraft were alive, he would be permitted to give this same evidnece from the stand, so this is not a self-serving declaration. Dying statements are admitted every day when it is shown they were made by parties who realized they were presently going to die. Mrs. Thomas cites the case of Daughters v. Com., 255 Ky. 172, 73 S. W. (2d) 10, as holding that in quoting an alleged dying statement all statements of the decedent must be shown. The evidence does not disclose that Craycraft made any statement other than that given. The two witnesses who testified to this statement of Craycraft were rigidly cross-examined, but they were not asked if he made any other statement, and the four or five other parties who were present were not called. There is no showing the defendant could not have procured their testimony if she wanted it. There is no

ground for saying that Craycraft made any other statement. The reason the dying statement was excluded in the Daughters Case is that the dying man said that he was not telling all that occurred there. That is not true in this case. Defendant's motion to exclude all the evidence relative to this dying declaration was properly overruled.

Tackett was arrested by Officer Lisle, and, when the latter was testifying out of the presence of the jury, he stated that on the way to jail Tackett said repeatedly, "I am the one that done the shooting and if I had not run out of loads I would have got another God damned son of a bitch." The court correctly refused to allow this evidence to go to the jury, as it was hearsay. See Minniard v. Com., 158 Ky. 210, 164 S. W. 804, headnote 3; Watkins v. Com., 227 Ky. 100, 12 S. W. (2d) 329, headnote 8; Mullins v. Com., 172 Ky. 92, 188 S. W. 1079; Selby v. Com., 80 S. W. 221, 25 Ky. Law Rep. 2209; Bacigalupi v. Com., 101 S. W. 311, 30 Ky. Law Rep. 1320; Marcum v. Com., 227 Ky. 356, 13 S. W. (2d) 243, and 30 C. J. p. 169, sec. 389; 16 C. J. p. 643, sec. 1278.

Tackett was available to Mrs. Thomas as a witness, had she wanted to introduce him.

Mrs. Thomas denied making to her daughter, Mrs. Craycraft, any threat that she would end Craycraft's life, and she now urges as error the admission of this threat over her objection, because it was, so she says, too remote (about four months), but in Tuttle v. Com., 33 S. W. 823, 17 Ky. Law Rep. 1139, evidence was admitted of threats made seven months before; in Abbott v. Com., 68 S. W. 124, 24 Ky. Law Rep. 148, the admitted threat had been made a year before; and in Crum v. Com., 202 Ky. 374, 259 S. W. 708, 709, we said:

"The general rule is to admit threats made by the appellant against the deceased regardless of its remoteness, as the element of time goes to the weight, but not the competency, of the evidence."

See 30 C. J. p. 156, sec. 370.

In testifying about concealing the .32-caliber pistol, Mrs. Thomas said:

"They taken me over to the jail there; I don't know who went up with me to the third floor; I goes back to the ladies' department; in taking my coat off this

gun falls out of the pocket; that is the first I remembered that I had the gun after I had taken it and put it in my pocket to keep him from shooting some of us; I picks up the gun and there was a mattress folded right by this commode; I slid it between the mattress.''

Her counsel then asked her if she was conscious of having this pistol on her person until she got up there, and the court properly sustained an objection to the question, as it was only asking for a repetition of what she had just stated.

Mrs. Thomas moved to exclude the testimony of Osborne relative to the sale of shells to her, but that motion was properly overruled. See 30 C. J. p. 160, sec. 376.

### Motion to Strike.

Defendant moved to strike certain questions contained in the cross-examination of the defendant, and we give here those questions and answers to them:

"Q. How many drinks had Tackett and Anderson had? A. I don't know a thing about that.

"Q. Had you had any shots of dope or other intoxicant that evening just before this shooting? A. No sir.

"Q. Thursday before this shooting on Saturday night—Thursday afternoon, didn't you state to Anderson out there at Mrs. Ragland's house, that you were going to kill this son of a bitch, speaking with reference to Garnett Craycraft, the first time you saw him? A. I did not.''

The defendant cites Fugate v. Com., 211 Ky. 700, 277 S. W. 1029, in support of her contention that the court erred in overruling her motion. In the Fugate Case the court over Fugate's objection allowed character witnesses to be asked certain questions there set out, and failed to admonish the jury of the effect of them, and that failure to admonish was held to be error, but in this case Mrs. Thomas' answers completely refuted these questions, and there was no need for any admonition.

### Colloquy During Argument.

In the course of the closing argument by Mr. Smith,

the attorney for the commonwealth, this took place. Mr. Smith:

"There was nothing to hinder them from putting Tackett on the stand. Mr. Tackett was as available to the defense as a witness as he was to the commonwealth.

"Mr. Haggard: We object to that. No sir, we were not allowed to talk to Tackett, except in the presence of Tackett's attorney. I say that was unfair—you know the circumstances, we could not put him on.

"The Court: I don't think either one of you wanted to put anybody on the stand, I think you were both afraid.

"Mr. Haggard: We object to that statement."

"The Court: It may or may not be a proper matter of comment as to why certain persons were not introduced as witnesses. There is nothing that prevents either the commonwealth or the defendant from introducing such persons as they think can give competent testimony. I have never thought that it was a matter of properly legitimate argument to undertake to assume that either side because they did not introduce a witness was afraid to do it. So I will exclude all the argument in this case, both by the commonwealth and by the defendant, as to any comment as to why certain persons were not introduced as witnesses. Proceed under the ruling of the court. [To all the foregoing the defendant, by counsel, objected and excepted, and moved that both the statement of Mr. Smith and of the court be excluded from consideration by the jury, and the court overruled said motion, to which the defendant excepted.]"

The attorney for the commonwealth had a perfect right to comment upon the failure of the defendant to offer Tackett as a witness. See McElwain v. Com., 146 Ky. 104, 142 S. W. 234; Davis v. Com. (Ky.) 121 S. W. 429; Sellards v. Com., 12 Ky. Op. 319, 5 Ky. Law Rep. 330; Davis v. Com., 191 Ky. 242, 229 S. W. 1029; 16 C. J. p. 906, sec. 2252.

If defendant had called Tackett as a witness and he had refused to testify, then comment by the attorney for the commonwealth would be improper. See first

two cases cited above. However, there is authority condemning such comment where the evidence of such witness is equally available to both parties. See 64 C. J. p. 271, sec. 290, note 69. Moreover, the court certifies this argument was made in response to some sort of an argument made by Mr. Haggard for the defendant.

The court's remark that he thought both sides were afraid to put Tackett on the stand was never withdrawn, as Mrs. Thomas points out in her reply brief, but by it the court did not tell the jury anything that its members were not perhaps already thinking; certainly it was a matter apparent to every one, and it was not prejudicial.

## Instructions.

The instructions given were apparently taken from Coleman v. Com., 207 Ky. 301, 269 S. W. 321, Stout v. Com., 123 Ky. 184, 94 S. W. 15, 29 Ky. Law Rep. 627, 13 Ann. Cas. 547, or Cavanaugh v. Com., 172 Ky. 799, 190 S. W. 123, and such instructions were not only approved in those cases but in three recent cases, Shelton v. Com., 255 Ky. 745, 75 S. W. (2d) 494; Richmond v. Com., 255 Ky. 758, 75 S. W. (2d) 500; and Fyffe v. Com., 256 Ky. 145, 75 S. W. (2d) 778.

## The Final Complaint.

Mrs. Thomas had made a motion for a directed verdict at the close of the evidence for the commonwealth, and she renewed it at the close of all the evidence. Each time it was overruled. That is one alleged error urged for reversal; that the verdict is not supported by the evidence and is contrary thereto is another; and that the verdict appears to have been given under the influence of passion and prejudice and is not sustained by the evidence is yet another. We shall treat these together.

Mrs. Thomas had made a threat to kill Craycraft. She made preparation to do so by buying shells to fit the sawed-off shotgun. She had that gun and two pistols in this automobile. Craycraft was mortally wounded by a shot fired from this automobile. It happened in a lighted street. He was at the door of the machine when the pistol was thrust almost against his chest and fired. A man usually knows his mother-in-law, and, as he was bleeding to death, he said she did it. She had, and tried to hide, a .32-caliber pistol. A leaden ball of

that size was cut from Craycraft's body. Everything says she shot him, and the only witness to the contrary is Mrs. Thomas. The evidence shows she had a bad reputation, and, unfortunately for her, the jury did not believe her. That was its question, and its verdict is abundantly sustained.

Judgment affirmed.